*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0091a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SHERMAN PETTY,

　　　　　　　*Plaintiff-Appellant,*

　　*v.*

COUNTY OF FRANKLIN, OHIO, et al.,

　　　　　　　*Defendants-Appellees.*

No. 06-3552

>

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 04-00245—Edmund A. Sargus, Jr., District Judge.

Submitted: February 1, 2007

Decided and Filed: March 6, 2007

Before: MARTIN, COLE, and GILMAN, Circuit Judges.

---

**COUNSEL**

**ON BRIEF:** Byron L. Potts, Eric LaFayette, BYRON L. POTTS & COMPANY, Columbus, Ohio, for Appellant. Tracie M. Boyd, FRANKLIN COUNTY PROSECUTOR'S OFFICE, Columbus, Ohio, for Appellees.

---

**AMENDED OPINION**

---

　　　　BOYCE F. MARTIN, JR., Circuit Judge. Plaintiff-Appellant Sherman Petty sustained serious injury to his jaw during a fight with other inmates in the Franklin County Correctional Institute. He sued numerous county defendants under 42 U.S.C. § 1983, alleging primarily that they violated his Eighth Amendment rights by failing to protect him and by failing to provide him with adequate medical care. In particular, Petty claimed that the County's delay in allowing him to undergo surgery, and its failure to provide him exclusively with a "soft" diet prior to the surgery, was the direct cause of his suffering further injury. The district court dismissed Petty's claims against some defendants for failure to state a claim, and against others upon their successful motion for summary judgment. Petty now appeals the dismissal of his claims. For the reasons stated below, we **AFFIRM** the judgment of the district court.

I

　　　　On April 5, 2002, Petty was placed in the Franklin County Correctional Institute after being sentenced to serve twenty-four days in jail. He was put in a cell with about twenty other inmates.

1

According to Petty, as he was reading a book and sitting on a bunk bed, two inmates picked a fight with him, punching and kicking him several times. They also struck Petty with his own shoe and with an unidentified object. The entire altercation lasted about five minutes, at which point Petty was finally able to get a guard's attention. The guard realized Petty was seriously injured, because he was bleeding badly from the mouth, and thus let him out of the cell and gave him a towel to soak up the blood.

Petty initially told the guard that he "fell off a bunk," but upon the guard's prodding admitted that "they beat me up." The guard then brought pictures of the inmates to Petty so that he could identify who had beaten him. He positively identified two inmates. Petty was then taken to a doctor at the jail, who recommended that he be transported to the Ohio State Medical Center Emergency Room for treatment.

Petty was initially examined by Drs. Sorabh Khandelwal and Chadwick Miller, who determined that his jaw was broken in two places. One of the fractures did not require surgery. The second fracture did require surgery, but not immediately, and thus Petty was discharged with instructions to take percocet for pain, amoxicillin to prevent infection, and to be kept on a "soft" diet. The attending surgeon who ultimately operated on Petty, Dr. Gayle Gordillo, stated that he was not operated on immediately because the injury occurred late on a Friday night, and she does not perform surgeries on the weekends except in emergencies.

In the early morning hours of Saturday, April 6, Petty was returned to jail and placed in a cell designated for medical care. Petty admits that every day he was given his prescribed medications, but the parties dispute what kind of food he was actually served. Petty claims that he "only got fed a liquid diet three times when [he] was in jail," whereas the other times he was fed the "regular," solid-food menu. The Sheriff's Office counters that he was fed according to a special dietary order which specifically prescribed a "liquid diet."[1] Despite receiving medication, Petty claims he was in considerable pain, and continually requested to see the doctor, only to be rebuffed by jail deputies. Dr. Gordillo contacted the Sheriff's Office Medical Department on April 9, requesting that Petty be brought in for surgery on Thursday, April 11, or Friday, April 12. She was informed that, due to "personnel issues," he could not be transported on the Thursday, and Friday would not work either, because the jail "never transports patients on Friday."

Petty was released from incarceration on Saturday, April 13 (well before his 24-day sentence was up, evidently), and Dr. Gordillo performed the surgery to realign his jaw on the following Tuesday, April 16. He was discharged on the same day. However, he returned to the emergency room on April 17 with symptoms of an infection. Dr. Gordillo treated him for a "wound infection" with a course of intravenous antibiotics and rest. He was released from Ohio State Medical Center on April 20.

Dr. Gordillo examined Petty on a follow-up visit on April 30 and again on May 21. He was experiencing some weakness in his right lower lip, which Dr. Gordillo stated "could be attributable to his surgery," but "is not attributable to the delay in surgery or treatment, and is not attributable to the infection that Mr. Petty incurred subsequent to his injury and surgery." As to the infection, Dr. Gordillo posited as follows: "The timeframe between Mr. Petty's injury and surgery was longer than normal. It may or may not have contributed to the infection . . . . Certainly, the longer an

---

[1]According to Dr. Gordillo, a patient prescribed a "soft" diet may eat foods such as pudding and applesauce, whereas a patient prescribed a "liquid" diet may not eat any solid foods at all. Gordillo Aff. at ¶ 9. What is confusing is that both Petty and Defendants appear to use the terms "soft" and "liquid" interchangeably. In other words, even when the parties use the term "liquid" diet, they have in mind Dr. Gordillo's technical definition of "soft" diet. There is no contention by either party that Petty was unable to eat soft foods such as pudding; rather, the gist of Petty's complaint is that he was improperly fed "hard" foods, such as fish or hamburgers. Petty Dep. at 97, 100.

injury or wound remains open, the greater the risk for infection becomes." Petty was scheduled for another visit on May 28, but he did not appear, and he subsequently discontinued treatment with Dr. Gordillo.

## II

Petty brought suit in federal district court under 42 U.S.C. § 1983. The gravamen of his complaint concerned violations of his rights under the Eighth Amendment. Named as defendants were Franklin County, Ohio, the Franklin County Sheriff's Office, Sheriff James Karnes, and John Does #1-4. John Does #1 and #2 were Sheriff's Department employees: John Doe #1 was allegedly "on duty and assigned to the area of the jail where [Petty] was attacked"; John Doe #2 allegedly served Petty his meals, and brought only solid foods, not the prescribed soft diet. Compl. at ¶¶ 17, 20. John Does #3 and #4 are the two inmates identified visually by Petty after the incident, and later by name through jail records. The specifics of Petty's § 1983 allegations were as follows: first, that the county defendants failed to protect him from other inmates; and second, that the county defendants were deliberately indifferent to his serious medical needs when he was returned from the hospital, by (a) denying him access to medical care for his bleeding mouth, (b) failing to provide him on all occasions with the soft diet prescribed by Dr. Gordillo, and (c) failing to accommodate the request of Dr. Gordillo that he return for surgery on April 11 or 12, 2002. Petty also sought to hold the County, the Sheriff's Department, and Sheriff Karnes liable under § 1983 on a theory of municipal liability. Finally, Petty asserted state-law claims of negligence against the county defendants, and state-law claims of assault and battery against John Does #3 and #4.

Defendants Franklin County, the Sheriff's Office, and John Does #1 and #2 moved for dismissal of Petty's claims pursuant to Fed. R. Civ. P. 12(b)(6). The district court granted this motion as to all of these defendants. First, citing *Barrett v. Wallace*, 107 F. Supp. 2d 949, 954 (S.D. Ohio 2000), the district court held that the Franklin County Sheriff's Office is not a legal entity capable of being sued under § 1983. D. Ct. Op. at 6. Second, as to defendant John Does #1 and #2, the court found that they had never been properly identified or served pursuant to Fed. R. Civ. P. 4(m). The district court held: "Plaintiff had ample time to identify John Does #1 and #2. The Court finds no cause sufficient to justify setting aside the requirement of dismissal under Rule 4(m)." D. Ct. Op. at 7. Finally, as to defendant Franklin County, the district court noted that under *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978), a county may be found liable only if the alleged constitutional violation arose from an official policy or custom of the county. Accordingly, the court held as follows:

> Plaintiff identifies no official custom or policy of Franklin County with regard to his constitutional claim. In addition, Plaintiff fails to come forward with any facts to demonstrate how, even if there were a custom or policy of the county, his injuries are causally linked to the County's alleged failure to train and/or supervise. Consequently, Plaintiff's municipal liability claim fails as a matter of law.

D. Ct. Op. at 7.

The only one of Petty's claims to survive beyond the 12(b)(6) stage was an Eighth Amendment claim against Sheriff Karnes for his "deliberate indifference" to Petty's serious medical needs. Sheriff Karnes moved for summary judgment on this claim and the district court granted the motion, finding that Petty had met neither the objective nor the subjective component of a deliberate-indifference claim as to medical care. *See Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004). The district court noted that under the objective component, Petty "must place verifying medical evidence in the record to establish the detrimental effect of the delay." D. Ct. Op. at 10 (citing *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001)). The court found that Petty failed to meet this burden: "[Petty's] surgeon avers that it was not necessary to operate

on [Petty] on the day of the injury. Further, the evidence shows that the infection [Petty] later suffered and the difficulty he experienced moving his mouth after surgery were side-effects of the surgery itself, not attributable to [Petty] receiving surgery approximately ten days after the incident at the jail." *Id*. at 10-11 (citation omitted). As to the subjective component, the district court noted that Petty's burden was to show that the county actors had a "sufficiently culpable state of mind." *Napier*, 238 F.3d at 742. This burden Petty again failed to meet: "The undisputed evidence of record shows that Plaintiff was designated to a medical cell when he was returned . . . from the Ohio State University Medical Center on April 6, 2002. In addition, Plaintiff received his medicine and a liquid diet as prescribed." D. Ct. Op. at 11. In other words, Petty had pointed to no actions by county actors that could reasonably be construed as constituting behavior deliberately indifferent to his medical needs.

Having dismissed Petty's federal claims, the district court declined to reach the merits of any of his state-law claims. Petty now appeals, raising three issues for review.

III

We review *de novo* both the 12(b)(6) and summary judgment rulings below. "The district court's dismissal of a civil rights complaint on a 12(b)(6) motion is scrutinized with special care." *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994). In reviewing the dismissal, we must therefore "construe the complaint liberally in the plaintiff's favor and accept as true all factual allegations and permissible inferences therein." *Id*. Although "a complaint need not set down in detail all the particularities of a plaintiff's claim," *Westlake v. Lucas*, 537 F.2d 857, 858 (6th Cir. 1976), the complaint must nevertheless give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests," *Conley v. Gibson*, 355 U.S. 41, 47 (1957). "Thus, a 12(b)(6) motion tests whether the plaintiff has stated a claim for which the law provides relief." *Gazette*, 41 F.3d at 1064.

In our review of a district court's grant of summary judgment, "the facts and any inferences that can be drawn from those facts[] must be viewed in the light most favorable to the non-moving party." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1996)). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id*. (quoting Fed. R. Civ. P. 56(c)).

### A. Dismissal of Defendant John Does #1 and #2

Fed. R. Civ. P. 4(m) provides in pertinent part as follows:

> If service . . . is not made upon a defendant within 120 days after the filing of the complaint, the court . . . shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.

Petty filed his complaint on April 1, 2004. He has yet to identify John Does #1 and #2, and thus has yet to serve them, clearly in violation of the 120-day window provided by Rule 4(m). Furthermore, the district court ruled on this particular 12(b)(6) motion only after the close of discovery—that is, Petty was given ample time to figure out who John Does #1 and #2 might be. The thrust of Petty's argument, however, seems to be that John Does #1 and #2 should not have been dismissed because even if not personally (actually) served, they were on constructive notice of the lawsuit. In other words, because Sheriff Karnes and Franklin County were properly served, the two John Doe deputies—who served at the direction of the Sheriff and the County and whose behavior allegedly

gave rise to some of Petty's § 1983 claims—should have been on notice that they were being sued as well.

What Petty fails to grasp, however, is that his constructive-notice argument makes sense only if, at some point, he actually substitutes the names of real persons for his John Doe defendants.[2] To be sure, the John Does #1 and #2 in this case could reasonably have been expected to know of Petty's suit, assuming of course both remain in Franklin County's employ. But that is not enough to make them parties to the lawsuit without their being specifically named. *See, e.g.*, *Doe v. Sullivan County*, 956 F.2d 545, 552 (6th Cir. 1992) ("Although as jailers the three defendants reasonably could be expected to have known of the instant suit, this alone is insufficient to impute to them knowledge of their future status as defendants. Many jailers and employees who were not named as defendants were aware of and even deposed in this case.").

It should not have been difficult to obtain the name of John Doe #1, the individual Petty alleges was "on duty and assigned to the area of the jail where [he] was attacked and failed to intervene or otherwise protect [him] during the attack . . . ." Compl. at ¶ 17. Nor should it have been difficult to identify John Doe #2, who Petty alleges gave him only solid foods upon his return from the hospital, despite his request (and the doctor's orders) for a soft diet. Compl. at ¶ 20. Nor is there a scintilla of evidence in the record that Franklin County in any way impeded Petty's efforts to discover the identities of John Does #1 and #2. In fact, nowhere in his appellate brief does Petty offer a rational explanation—or any explanation at all, for that matter—for why the identities of John Does #1 and #2 still elude him even after discovery.

The district court was therefore correct in dismissing John Does #1 and #2 from the lawsuit, and this dismissal—involving the two county officials most directly implicated in Petty's civil rights claims—significantly undermines the remainder of Petty's claims.[3]

---

[2]Had this been the case, then Petty's constructive notice argument might have turned into one that has been frequently brought by civil rights plaintiffs. *See generally* Howard M. Wasserman, *Civil Rights Plaintiffs and John Doe Defendants: A Study in Section 1983 Procedure*, 25 CARDOZO L. REV. 793 (2003). The typical scenario involves a plaintiff who names John Doe defendants in his initial complaint and then, at some later point (usually when discovery reveals the true names of the John Does), seeks to amend the complaint under Fed. R. Civ. P. 15. Often the plaintiff's motion to amend is denied because the applicable statute of limitations has run. The plaintiff then seeks to circumvent the limitations problem based on constructive notice, by invoking the "relation back" provision of Rule 15(c), which applies when a defendant "*knew or should have known* that, but for a mistake concerning the identity of the proper party, the action would have been brought against the [defendant]." Fed. R. Civ. P. 15(c)(3)(B) (emphasis added); *see also Friedmann v. Campbell*, No. 98-6728, 1999 WL 1045281 (6th Cir. Nov. 8, 1999) (unpublished).

Because Petty has made no motion to amend his complaint in which he substitutes real names for his John Doe defendants, this more "typical" John Doe scenario is not before us, and we decline to speculate how it might be resolved in this case. Here, Petty is up against a fundamental service-of-process problem, not a technical relation-back problem involving Rule 15(c).

[3]Petty maintains that because a dismissal on Fed. R. Civ. P. 4(m) grounds is *without* prejudice, he should not have been subject to a 12(b)(6) dismissal, which is generally construed as a dismissal *with* prejudice on the merits. Appellant's Br. at 13-14, 20-21. This argument, while technically correct, is of little practical relevance given the fact that even if Petty were permitted to re-file his claim today, he would be barred by the applicable statute of limitations. *See* 3 Moore's Federal Practice § 4.82[3] ("[A]ny dismissal ordered [under Rule 4(m)] after expiration of the statute of limitations for failure to establish good cause will be, in effect, with prejudice since plaintiff will be precluded from commencing a new action.") (citing various circuit court decisions). Petty's claim arose in April 2002, and the applicable statute of limitations in this case, Ohio Rev. Code § 2305.10, is two years. Thus, even if the Rule 4(m) dismissal was without prejudice, a *new* claim filed today against the prison guards (as opposed to an amended claim relying on Rule 15(c), *see* n.2 of this opinion) would clearly be time-barred. *See also* Appellee's Br. at 9-11.

**B. Dismissal of Defendants Franklin County and Franklin County Sheriff's Office**

The district court dismissed the Franklin County Sheriff's Office as a party because under Ohio law, a county sheriff's office is not a legal entity capable of being sued for purposes of § 1983. *See Barrett*, 107 F. Supp. 2d at 954-55. In his appellate brief, Petty cites only one case to refute this authority, *United Food & Commercial Workers Local 1099 v. City of Sidney*, 364 F.3d 738 (6th Cir. 2004). But *United Food* is totally inapposite, because it did not involve an Ohio county sheriff's *office* as a named defendant. Rather, it involved a county *sheriff* as named defendant. Unlike a county sheriff's office, the sheriff himself may be considered a proper legal entity for purposes of suit under § 1983. In fact, that is exactly what the district court did in allowing Petty's suit against Sheriff Karnes to proceed at least to the summary judgment stage. There is no merit, therefore, to Petty's argument that the Franklin County Sheriff's Office be implicated as a separate legal entity in this suit. *See also Batchik v. Summit County Sheriff's Dep't*, No. 13783, 1989 WL 26084, at *1 (Ohio Ct. App. Mar. 15, 1989) (unreported) (noting that the Summit County *Sheriff*, but not the Summit County Sheriff's *Department*, was an entity capable of being sued).

We also affirm the district court's dismissal of defendant Franklin County, but on alternate grounds. Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), county liability is limited to situations in which the deprivation of constitutional rights results from an official policy or custom of the county. The mandate of *Monell* and its progeny requires (1) that a municipality be held liable only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury," *Monell*, 436 U.S. at 694, and (2) that there be an "affirmative link between the policy and the particular constitutional violation alleged," *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). *See Bennett*, 410 F.3d at 818-19 (6th Cir. 2005). The initial question, then, is whether or not Petty's complaint properly states a claim for municipal liability under *Monell* and *Tuttle*.

The third claim in Petty's complaint, labeled as "Municipal Liability," states in full as follows:

> 38.   Plaintiff hereby incorporates by reference thereto the preceding thirty-seven (37) paragraphs as if fully rewritten herein.
>
> 39.   Said acts by the individual Defendants County, Franklin County Sheriff's Department, Jim Karnes, John Doe #1 and John Doe #2, were proximately caused by *certain customs and policies* of Defendants County, Franklin County Sheriff's Department and Karnes, *including but not limited to, a failure to adequately and reasonably train, supervise and discipline officers in such a way to properly protect the constitutional rights of citizens; and a specific set of policies established during the days of the incidents described above, which had the effect of permitting, encouraging, approving and ratifying violations of the constitutional rights of citizens, including Plaintiff*, as described above.
>
> 40.   Defendants actions and conduct were the actual and proximate cause of injury, damages and losses sustained by Plaintiff.

(Emphasis added.) The district court held that this complaint did not meet the 12(b)(6) bar, because it "identifies no official custom or policy of Franklin County with regard to his constitutional claim," and because it "fails to come forward with any facts to demonstrate how, even if there were a custom or policy of the county, [Petty's] injuries are causally linked to the County's alleged failure to train and/or supervise." D. Ct. Op. at 7.

We are not convinced that the district court was correct in dismissing Petty's municipal-liability claim at the 12(b)(6) stage. A "district court's dismissal of a civil rights complaint on a 12(b)(6) motion is scrutinized with special care." *Gazette*, 41 F.3d at 1064. In this case, the district court itself recognized that it is not authorized to grant a motion to dismiss under 12(b)(6) unless it is "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." D. Ct. Op. at 5 (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)). Given the allegations that Petty makes in his complaint, it is not immediately clear what more Petty could have alleged with respect to the policies that Franklin County might or might not have. We wonder how Petty would necessarily know, at the point of his *complaint*, and without the benefit of discovery, whether such a custom or policy might exist, and if it does exist, what its contours might be or how exactly it effected a violation of his constitutional rights.

At this stage in the proceeding, however, Petty's case does not hinge on his ability to *plead* municipal liability in proper fashion because, in any event, Petty is unable to survive summary judgment with respect to his claims against the County. The district court properly granted summary judgment on Petty's analogous claims against Sheriff Karnes in his official capacity, as discussed in the ensuing section. Because those claims, in this case, involve the same showing as the claims against the County, the County claims must also fail. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

## C. Summary Judgment in Favor of Sheriff Karnes

After the district court dismissed Franklin County, the Franklin County Sheriff's Office, and John Does #1 and #2 on the pleadings, the only remaining municipal defendant at the summary judgment stage was Sheriff James Karnes. Petty has put forward no evidence that Sheriff Karnes was present during any of the alleged incidents giving rise to his claims—namely, his being placed in a cell with violent inmates, his being denied a soft diet after the injury, and his being denied medical attention or transport to the hospital on Thursday, April 11, and Friday, April 12. Nor has Petty presented evidence that Karnes was directly involved in oversight of Petty's treatment. Certainly *other* county supervisory officials had some awareness of Petty's situation. For example, the record includes an affidavit from Chief Deputy Sheriff Mark Barrett, who reviewed Petty's paperwork with respect to his dietary order, which specified that he be given a "liquid diet." The record also includes an affidavit from Major Michael Herrell, who was the Facility Commander at the Franklin County Sheriff's Office and the person in charge of the Franklin County Correctional Institute. According to his affidavit, Herrell fielded several complaints from members of Petty's family in which they claimed he was not receiving proper medical attention and was not receiving his prescribed liquid diet. Herrell's actions were also recorded in an inter-office memo sent to Barrett on April 12, 2002. Yet neither in Petty's complaint, nor in his affidavit attached to his reply to the Defendants' motion for summary judgment, nor in his entire deposition, is there any whiff of Sheriff Karnes's personal involvement in or awareness of—either directly or indirectly—Petty's situation.

What is odd about the posture of this case, then, is that John Does #1 and #2, the prison deputies against whom a § 1983 failure-to-protect or denial-of-medical-care claim most directly should lie, and regarding whose actions such a claim most properly could be assessed, were dismissed from the suit (for improper service, as discussed in Part III-A above). And other prison officials who had some knowledge of what was going on with Petty, such as Deputy Sheriff Barrett and Major Herrell, were not even named as defendants. With this in mind, to the extent Petty's suit is against Karnes in his *personal* capacity, it must fail. In fact, by assessing Petty's claim against Karnes according to the objective/subjective framework laid out in *Blackmore*, the district court went above and beyond what it needed to do. There simply is no evidence that Sheriff Karnes was in any way directly involved in what happened to Petty, either initially when he was beaten in the

jail cell, or later when his surgery was delayed and his requests for liquid food were allegedly not met. As this Court has stated, in order for § 1983 liability to attach to an individual municipal supervisor,

> [t]here must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.

*Taylor v. Michigan Dep't of Corrs.*, 69 F.3d 76, 81 (6th Cir. 1995) (emphasis omitted) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)); *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991) (stating that to establish *personal* liability of a government official under § 1983, a plaintiff must show that the official *caused* the deprivation of a federal right). Thus, if Petty's suit is against Karnes in his personal capacity, Petty fails to meet the causation requirements laid out in *Taylor*.

To the extent that Petty's suit is against Karnes in his *official* capacity, it is nothing more than a suit against Franklin County itself. *Graham*, 473 U.S. at 166; *see also* Defendants' Memorandum in Support of Motion to Dismiss and Motion for Summary Judgment, 10/3/2005, at 17-22. And as Defendants point out, Petty was unable to come forward with evidence—beyond the bare allegations in his complaint—showing that a Franklin County custom or policy was the moving force behind the violation of his constitutional rights. *See, e.g.*, *Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005). Quite to the contrary, the record clearly indicates that County officials acted with due care in responding to Petty's injuries and medical needs. To be sure, County officials did not permit Petty to be transported to the hospital for surgery on April 11 or April 12. But Petty has presented no evidence that his injury was exacerbated by the failure to operate on those dates. Petty's surgery had been put off once before (when he was initially brought to the hospital on April 5), and Dr. Gordillo did not express concern that it be put off again. In fact, any delay in Petty's surgery would seem to be attributable more to Dr. Gordillo's own schedule—i.e., that she does not operate on weekends except in emergencies—than to any policy or custom of Franklin County. Petty similarly fails to present evidence of any County custom or practice that jeopardized his safety, let alone caused his injury, when he was initially placed among other inmates in jail. Finally, Petty fails to raise a genuine issue of material fact that the County failed to train its employees in a manner amounting to "deliberate indifference" to his safety or medical needs. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Even with the benefit of discovery, therefore, Petty simply has not established a violation of his constitutional rights that can in any way be attributed to Franklin County.

IV

For the above reasons, we **AFFIRM** the judgment of the district court.