**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0141n.06
Filed: March 7, 2008

Nos. 05-2511 and 07-1071

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| FRANK J. LAWRENCE, JR., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| BLOOMFIELD TOWNSHIP et al., | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellees. | ) | |

Before: ROGERS and SUTTON, Circuit Judges; and BERTELSMAN, District Judge.[*]

PER CURIAM. Frank Lawrence challenges the district court's summary rejection of his constitutional and state law claims arising out of an encounter with several officers prompted by a response to a 911 call. Because exigent circumstances justified the officers' warrantless entry into the house where Lawrence was staying and because Lawrence's obstruction of the officers justified their use of force against him, we affirm.

I.

*The Incident.* On the evening of August 19, 2000, the Bloomfield Township police received a 911 domestic-violence report. Township Officers Gary Godlewski and Sean Kelley responded

---

[*] The Honorable William O. Bertelsman, Senior District Judge for the Eastern District of Kentucky, sitting by designation.

first. As they approached the house, the officers saw Christian Lawrence, a young child, through a screen door and beckoned him outside. Once Christian came outside, the officers observed that his eye was swollen and bleeding from a sizeable cut. Christian told the officers that his father, Frank Lawrence, Sr., had hit him. When the father appeared at the door, an officer asked him to come out of the house and arrested him.

Officer Scott Monkonen soon arrived, and he and Godlewski observed Frank Lawrence, Jr., ("Lawrence") in the kitchen. The officers asked Lawrence to step out of the house, and Lawrence responded, "F[ ] you." Godlewski asked him again if he would "please step out and talk . . . for a minute," and Lawrence responded, "F[ ] you. Arrest me." Monkonen explained to Lawrence that the officers were "investigating a criminal act that took place on the property," that they needed to come into the house and that they did not "have to get a search warrant." Another officer, Officer McAtee, testified that she heard a lot of "screaming and yelling" and that Lawrence yelled several times, "You're not coming in my house. You need a search warrant."

Instead of complying with the officers' request, Lawrence stood with his legs spread in the doorway and "us[ed] his body to block the entrance." After it became clear that Lawrence would not cooperate, the officers reached into the house, pulled Lawrence out, took him to the ground and told him to sit down on a bench. Monkonen conducted a protective sweep of the house to look for additional suspects or potential victims, and McAtee entered the house with Christian to find the board with which his father hit him.

Lawrence was charged with interfering with a police officer. Before his criminal trial began, Lawrence filed several actions—a declaratory action in the Oakland County Circuit Court, this § 1983 action in the Eastern District of Michigan and a petition for a writ of mandamus in this court—challenging the legality of his arrest and prosecution and seeking in one way or another to enjoin the criminal case. None of these actions succeeded in postponing his trial.

*Lawrence's Criminal Trial.* At Lawrence's one-day criminal trial, the defense questioned whether the officers needed to enter the house given that they had secured the suspect and the victim and that the dispatcher had said that three people were involved. The police chief testified that the county treats domestic-violence calls seriously and that township officers are required to secure the crime scene to ensure that no other victims are present and to seize any weapons. Monkonen testified that, if a dispatcher tells officers how many people are at a crime scene, that is not "the end of the story" because "the dispatchers are just hearing one side of the story"; they still need to "make sure that that information was true" and "cover all bases" so that they would not find out later that "there was another victim inside the house that was severely injured."

In addition to challenging the officers' justification for entering the house, Lawrence gave a slightly different account of his interaction with the officers. He said the police never told him they wanted to enter the home to look for evidence, insisting he refused to leave the house because he was just wearing his underwear. Monkonen testified that he grabbed Lawrence's arm, "put [his] left hand on the top of [Lawrence's] head [and] ordered him to go to the ground," but Lawrence testified that the officers pulled his hair, "dragged [him] out like an animal . . . and stomped on [his] leg."

The jury returned a guilty verdict. The Oakland County Circuit Court upheld the verdict, and the Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal. *See People v. Lawrence*, 698 N.W.2d 400 (Mich. 2005).

*The Instant Action.* In this action, Lawrence sued (1) Bloomfield Township, (2) Officers Godlewski, Monkonen, Kelly and McAtee and Detective James Cutright, and (3) Police Chief Jeffery Werner and Township Supervisor David Payne. He alleged that the ordinance under which he was convicted was unconstitutional, that the police officers' arrest, prosecution and use of force violated his First, Fourth and Fourteenth Amendment rights under § 1983 and that the officers committed various state-law torts.

After Lawrence failed to obtain relief in his appeal of the criminal conviction, the district court granted defendants' motion for summary judgment. It rejected all of his federal claims on the merits and declined to reach his state-law claims.

II.

A.

The district court correctly rejected Lawrence's Fourth Amendment claims against Bloomfield Township, Payne and Werner for municipal and supervisory liability. To maintain a claim for municipal or supervisory liability based upon a single instance of allegedly unconstitutional conduct, a plaintiff must prove that "an existing, unconstitutional municipal policy" caused the

injury. *City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985). There is nothing facially unconstitutional about the township's general order, which advises officers to "consider the domestic violence scene as a criminal investigation[,] . . . establish contact with all parties involved, [and] secure and impound as evidence or [for] safekeeping, any weapons." In most domestic-violence cases, "[n]o question . . . reasonably could be [raised] about the authority of the police to enter a dwelling to protect a resident." *Georgia v. Randolph*, 547 U.S. 103, 118 (2006). Nor has Lawrence alleged that the police have routinely implemented the policy in a way that leads to, or permits, unreasonable searches and seizures. Because Lawrence has not provided any evidence of an "unconstitutional municipal policy," *Tuttle*, 471 U.S. at 824, he cannot establish liability against the township or supervisors based upon this one encounter.

It makes no difference that, when the district court granted defendants' motion for summary judgment on the municipal-liability claims, it may have mistakenly invoked Rule 12(b)(6). The fact remains that, despite Lawrence's "ability to *plead* municipal liability in proper fashion, [he] is unable to survive summary judgment" because he did not provide evidence of an official policy encouraging constitutional torts. *Petty v. County of Franklin*, 478 F.3d 341, 348 (6th Cir. 2007) (affirming Rule 12(b)(6) dismissal on summary-judgment grounds).

B.

Lawrence's Fourth Amendment claim against the individual officers regarding their warrantless entry into the home fares no better. Exigent circumstances, all agree, may justify a

warrantless entry into a residence. *United States v. Morgan*, 743 F.2d 1158, 1161 (6th Cir. 1984). And those circumstances exist, we have held, when "real immediate and serious consequences . . . would certainly occur were a police officer to postpone action to get a warrant." *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002) (alterations and internal quotation marks omitted).

This case implicates two potential exigencies: (1) there was "a risk of injury posed to the officers or others that required swift action," *United States v. Huffman*, 461 F.3d 777, 783 (6th Cir. 2006), and (2) the officers had a "reasonable belief that the destruction of [evidence] was imminent," *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1513 (6th Cir. 1988). Like the district court, we think that the risk of danger posed to other individuals suffices to resolve this claim. Even when we read all of the inferences Lawrence's way, the officers still faced the following undisputed risks: (1) they were responding to a 911 call; (2) the call concerned a complaint about domestic violence; (3) the officers encountered a bloody victim when they arrived on the scene; and (4) they encountered a third individual (apparently neither the assailant nor a victim) who, far from cooperating with the officers' reasonable inquiries, belligerently and defensively greeted their every entreaty. Hindsight, it is true, shows that no other victim or assailant remained in the house, but a reasonable officer could fairly determine that he needed to conduct a brief search to ensure that was so.

While the dispatcher told officers that there were three people in the house, the officers had reasonable bases for ensuring that they had accounted for all potential victims and assailants. That is not just because officers may (and should) take domestic-violence 911 calls seriously, but also because these officers were entitled to "make sure that information" from the dispatcher "was true" so that they would not find out later that "there was another victim inside the house [who] was severely injured."

Lawrence of course did not help matters. "The complete picture after all includes more than just [the plaintiff's] refusal to provide information; it also includes profanity-laced yelling . . . at the officer[s], as well as the disruptive character of [his] speech." *Lyons v. City of Xenia*, 417 F.3d 565, 575 (6th Cir. 2005). That he was "yelling" at them, repeatedly saying "F[ ] you" and "using his body to block the [doorway]," could fairly give the officers pause that they had identified the only victim in the case and taken control of the only assailant. *See Thacker v. City of Columbus*, 328 F.3d 244, 254–55 (6th Cir. 2003) (holding that officers who faced a defendant who "acted belligerently and used profanity" could only dispel the "uncertainty . . . by entering the home and investigating further"); *see also United States v. Arch*, 7 F.3d 1300, 1304 (7th Cir. 1993) (holding that defendant's "irrational, agitated, and bizarre" behavior contributed to a finding of exigent circumstances); *United States v. Lalor*, 996 F.2d 1578, 1584 (4th Cir. 1993) (holding that defendant's prior "belligerent" behavior and "derogatory remarks" created exigency sufficient to justify entrance without knocking); *cf. Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (holding that individuals' "unprovoked" reactions "upon noticing the police . . . is not necessarily indicative of wrongdoing, but it is certainly

suggestive of such"). Lawrence's aggressive, aberrant behavior could reasonably lead the officers to believe that someone else was in the house. The district court correctly rejected this claim as a matter of law.

## C.

Nor did the officers use excessive force when they removed Lawrence after he "us[ed] his body to block the entrance to the door." The Fourth Amendment's reasonableness requirement establishes more than just "*when*" officers may seize an individual; it also governs "*how* [the seizure] is carried out." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Excessive-force inquiries in the context of a seizure balance "the nature and quality of the intrusion . . . against the countervailing governmental interests at stake," and we look at the propriety of a seizure "from the perspective of a reasonable officer on the scene." *Id.* at 396. Because "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving"—we must avoid judgments predicated upon "the 20/20 vision of hindsight." *Id.* "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (internal quotation marks and citation omitted).

Giving Lawrence the benefit of all factual inferences, we cannot say that the officers removed him in an unreasonable manner. The officers had authority to enter the home and a reason for doing so promptly. Yet Lawrence responded to their efforts by blocking the doorway and showering them with profanity. At that point, force of some sort was the only option available to the officers. And

the force they used was proportionate to the nature of the impediment and the erratic behavior of Lawrence. *See Thacker v. Lawrence County*, 182 F. App'x 464, 472 (6th Cir. May 17, 2006) (holding that officers did not use excessive force in wrestling to the ground "an upset, loud, and swearing individual who refused to calm down"). The apparent urgency of the situation gave the officers only "a few seconds to make up [their] mind[s]" about what to do, and their "split-second judgments," *Graham*, 490 U.S. at 397, reasonably responded to the situation at hand.

Lawrence's testimony that the officers "grabbed onto [his] hair," "dragged [him] out," "stomped on [his] leg" and "threw [him] up on a bench," does not change matters. He was of course physically and belligerently denying the officers access, a point he does not dispute, leaving the officers no reasonable option but to grab him as best they could and drag him to the bench, during which it is no doubt plausible (and unsurprising) that one of the officers firmly stepped on his leg. *See id.* at 396 (noting that courts must consider whether the target of force was "actively resisting" officers); *Lawrence v. Kenosha County*, 391 F.3d 837, 843 (7th Cir. 2004) (holding that officers reasonably pulled an arrestee aggressively out of a car where the arrestee was "combative and irrationally angry" and "a reasonable officer [could] believe that he was attempting to evade arrest"); *Smith v. Ball State Univ.*, 295 F.3d 763, 771 (7th Cir. 2002) (holding that officers' forcefully pulling an unresponsive individual from a car and attempting a knee strike was not excessive force because "a reasonable officer . . . could . . . misconstrue [the individual's] unresponsiveness as resistance requiring the minimal use of force"). Lawrence, moreover, has not provided any documentary evidence (medical or otherwise) of any injury caused by the officers' seizure.

The officers' testimony that Lawrence did not resist once they pulled him from the doorway does not undermine this conclusion. At most, this assertion proves that the level of force may have been "unnecessary" in "hindsight," *Graham*, 490 U.S. at 396, as Lawrence might have acquiesced when confronted with a lesser degree of force. But just as Lawrence's belligerent behavior ceased once the officers initiated the seizure, there is no evidence or testimony that the officers continued to apply physical force after he was out of the way. *Compare Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (concluding that brief force used to handcuff a resistant defendant was not unreasonable), *with Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 687 (6th Cir. 2006) (holding summary judgment inappropriate where plaintiff alleged that officers used force on an uncooperative arrestee "for about fifteen minutes" after he acquiesced).

D.

As for Lawrence's First Amendment and due process claims, we agree with the district court that "Lawrence was not arrested merely for his utterances" or for his request that the officers get a warrant. In order to state a prima facie case for First Amendment retaliation, Lawrence had to show that his "protected speech" was "a substantial or motivating factor in the adverse action." *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). Lawrence has not, and cannot, make this showing. The uncountered evidence shows that the officers arrested Lawrence for interfering with the officers' attempts to conduct a brief search of the house—not for the content of his speech or his assertion of rights. The officers had authority to enter the house, and Lawrence denied them access. Because

they legitimately premised their arrest on this obstructive conduct, they did not violate his First Amendment or due process rights.

E.

Lawrence's argument that his case should be remanded for an evidentiary hearing regarding the potential recusal of Judge Cohn has no merit. Recusal was necessary, he says, because Judge Cohn recused himself from a case where the 48th District Court (in its entirety) was a party to the lawsuit and because he allegedly called the state courts to determine the procedural status of Lawrence's conviction. Although Lawrence says some of the 48th District Court staff would be witnesses in this case if it went to trial, he never supports this assertion. And although some of the judge's friends allegedly work in the 48th District Court, it would not be an abuse of discretion to decline to recuse when friends are merely witnesses instead of the target of the lawsuit. Lawrence bears the burden of proving bias, *Rhodes v. McDannel*, 945 F.2d 117, 120 (6th Cir. 1991), and he has not met that burden here.

III.

For these reasons, we affirm.