**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0633n.06

Case No. 15-2465

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Nov 30, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| FATIMA VANGEL, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| NICHOLAS SZOPKO, AARON | ) | |
| FRANCKOWIAK, TIMOTHY WALSH, | ) | **O P I N I O N** |
| JOANNE BEEDLE-PERR, AND | ) | |
| CHRISTOPHER PELLERITO, | ) | |
| Defendants-Appellees, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PAT THOMAS, et al., | ) | |
| Defendants. | ) | |

BEFORE: McKEAGUE, GRIFFIN, and KETHLEDGE, Circuit Judges.

McKEAGUE, Circuit Judge. Defendant Police Officers Nicholas Szopko and Aaron Franckowiak entered Plaintiff Fatima Vangel's home to arrest her after they responded to a 911 call from her adult son James saying that she had assaulted him. She sued the Officers alleging that their warrantless entry violated her Fourth Amendment rights. The district court granted summary judgment in favor of the Officers holding that exigent circumstances justified their entry and thus no Fourth Amendment violation occurred. We **AFFIRM**.

In July 2009, James Vangel left the house he shared with his mother Fatima and called 911. James told the 911 operator that his mother had "just went psycho," attacked him, and that

a relative, Ali Chahine, had to pull his mother off him. In response to the 911 operator's questioning, James also said that his mother had a gun but that he did not think she would be violent with the police. He added, however, "Can you please hurry up? I'm scared. I don't know what [my mother and Chahine will] do."

The 911 operator dispatched the Dearborn Heights Police to the scene. She relayed to Officers Szopko and Franckowiak, via their in-car computer, the following:

> 19:27:04: MOTHER ATTACKED THE SON
> 19:27:38: REF RESC. FEMALE IS IN THE HOUSE WITH HER BROTHER IN LAW.
> 19:27:48: RIPPED THE CLOTHES, THREW GLASS AT THE CALLER
> 19:28:21: VANGEL/FATIMA/F 08/21/1958
> 19:28:33: FEMALE HAS GUN IN HER CLOSET
> 19:29:11: UNK[NOWN] DRUGS/ALCOHOL
> 19:29:37: CALLER IS WAITING AT THE CORNER OF ROSS/GULLEY.
> 19:29:49: FEMALE IS SCREAMING AT THE SUBJ[ECT] FROM THE HOME.
> 19:30:55: DOES NOT BELIEVE THEY WILL BE VIOLENT WITH OFC
> 19:31:16: FEMALE WAS THROWING ROCKS AT THE CALLER

(R. 46-2 Dispatch Log, Pg ID 1157-58).

When Officers Szopko and Franckowiak arrived, they found James standing on a street corner down the block from his house. James's shirt was ripped open, and he told the Officers that his mother had attacked him, scratched him, and thrown a decorative glass ball at him. He also told the officers that Chahine had to pull his mother off him during the attack. The Officers say James reiterated to them that Fatima was acting "psycho." They placed James in their patrol car and then parked in front of the house.

When the Officers approached the house, the front door was swung open but the glass storm door was shut. Chahine had exited onto the porch and met the Officers there. The Officers spoke with Chahine briefly, and James confirmed from the backseat of the police cruiser that Chahine had not attacked him.

Everyone outside the house at this point—Chahine, the Officers, and James—agrees that the Officers could see Fatima in the front hallway through the storm door as they approached. Chahine and the Officers also say that Fatima retreated towards the back of the house as the Officers approached the door. Fatima says, however, that she exited a bathroom into the front hallway just as the Officers were opening the storm door and entering the house. In any event, the Officers entered the house while Fatima stood in the front hallway and arrested her. She faced a domestic violence charge and eventually pled no contest.

Fatima later sued Officers Szopko and Franckowiak, as well as several other defendants, under 42 U.S.C. § 1983 asserting civil rights violations based on this incident and another from 2012. Her complaint alleged that the Officers violated her Fourth Amendment rights, as incorporated by the Fourteenth Amendment, during this 2009 arrest. Specifically, she says that the Officers' entry was unlawful because they failed to obtain a warrant. *See Payton v. New York*, 445 U.S. 573, 576 (1980) (holding that the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest"). Defendants moved for summary judgment based on qualified immunity. The district court granted the motion as to this 2009 incident because it found exigent circumstances justified the warrantless entry.

We review a district court's grant of summary judgment based on qualified immunity de novo and view the facts in the light most favorable to plaintiff. *Davenport v. Causey*, 521 F.3d 544, 550 (6th Cir. 2008). "Qualified immunity gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (quotation marks and citations omitted).

The doctrine applies irrespective of "whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.*

To overcome qualified immunity, Fatima must make two showings: first, that the Officers' conduct violated a constitutional right; second, that the right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). We may address either prong first. *Id.* at 236. Her failure on either prong ends her case. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) ("If the law . . . did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation."). With the clearly-established prong, "[i]t is important to emphasize that this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (quotation marks and citations omitted). A reasonable officer must "understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). So we ask here whether clearly established law showed that exigent circumstances did not exist in this situation. *See id.* at 640–41. And Fatima fails to show that the Officers' exigency determination, even if mistaken, contradicted clearly established law in this particularized sense.

The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. The "physical entry of the home is the chief evil" the Amendment's language contemplates. *United States v. United States District Court*, 407 U.S. 297, 313 (1972). Thus, it is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)) (quotation marks omitted).

But sometimes "the exigencies of the situation make the needs of law enforcement so compelling" that a warrantless entry "is objectively reasonable under the Fourth Amendment." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quotation marks and citation omitted). As a general proposition, "the risk of danger to the police or to other persons inside or outside the dwelling" may make warrantless entry reasonable. *Minnesota v. Olson*, 495 U.S. 91, 100 (1990) (quoting approvingly this formulation by the Minnesota Supreme Court); *see also Georgia v. Randolph,* 547 U.S. 103, 118 (2006) ("[I]t would be silly to suggest that the police would commit a tort by entering . . . to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur."). In a specific case, we ask whether the facts would justify a belief in an objectively reasonable officer that entry into the home was necessary because of "real immediate and serious consequences that would certainly occur were a police officer to postpone action to get a warrant." *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002) (quotation marks, alterations, and citations omitted). We look at the totality of the circumstances viewed from the officers' perspective at the time the incident occurred. *See United States v. Johnson*, 9 F.3d 506, 508 (6th Cir. 1993).

Here, the Officers cite considerations that support a reasonable belief that exigent circumstances existed. To begin with, they responded to a call potentially fraught with risk: a domestic disturbance. *See United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005) ("Indeed, more officers are killed or injured on domestic violence calls than on any other type of call.") (citing *Hearings before Senate Judiciary Committee*, 1994 WL 530624 (Sept. 13, 1994) (statement on behalf of National Task Force on Domestic Violence) (F.D.C.H.). Further, the victim they encountered had sustained visible injuries, described his mother as acting erratically, and told them that she had access to a gun in her closet. The Officers, like the district court, rely

on an unpublished case from this circuit to assert that these facts, combined with the observation that Fatima might retreat into the house, established exigent circumstances. *See Lawrence v. Bloomfield Twp.*, 313 F. App'x 743, 747 (6th Cir. 2008) (finding exigent circumstances where officers: (1) responded to a 911 call concerning domestic violence; (2) encountered a bloody victim; and (3) encountered an individual in the home who responded belligerently and defensively).

Fatima makes some sensible points in response. An exigency justifying warrantless entry is less apparent where, as here, the officers have information that the suspect is alone in the house. *Cf. Ewolski*, 287 F.3d at 503 (discussing the importance innocent victims inside the house plays in some exigency determinations). Further, a weapon's mere presence in a home does not constitute a sufficiently exigent circumstance to justify warrantless entry. *See, e.g.*, *United States v. Tatman*, 397 F. App'x 152, 163 (6th Cir. 2010) ("The presence of a weapon can create an exigent circumstance if 'the government is able to prove they possess information that the suspect was armed and *likely to use a weapon or become violent*.'") (quoting *United States v. Bates*, 84 F.3d 790, 795 (6th Cir. 1996) (emphasis added)). Fatima plausibly argues that the Officers faced a situation less obviously dire than most cases where an exigency exception to the warrant clause applies.

Still, she has not shown the Officers' determination that exigent circumstances justified entry—if a mistake—was an objectively unreasonable mistake under clearly established law. Like the officers in *Lawrence*, the Officers here responded to a 911 call about a domestic dispute and found a victim that appeared to have been attacked. Domestic dispute calls are dangerous, in part, because emotions run high. And the Officers had reports of violent behavior that raised red flags about Fatima's current mental and emotional state. *Cf. Thacker v. City of Columbus*,

328 F.3d 244, 254–55 (6th Cir. 2003) (finding plaintiff's belligerency relevant to exigency calculation); *United States v. Arch*, 7 F.3d 1300, 1304 (7th Cir. 1993) (finding "irrational, agitated, and bizarre" behavior contributed to a finding of exigent circumstances). The Officers did not need to accept James's assurance that he did not "think" or "believe" his mother would be violent with them. Given what they heard about Fatima's behavior, that she reportedly had a gun in her closet, and that she could retreat into the house, they acted quickly to prevent her from potentially gaining access to her gun. That she was the only one in the home lessened the risk of danger. But only to a point—Fatima could obviously shoot a gun through the storm door at James or the Officers.

This case implicates an area entitled to the strongest Fourth Amendment protection: the home. But it also implicates a compelling law-enforcement interest: the prevention of violence. Even if the Officers erred in balancing these interests, we cannot say that their error was objectively unreasonable under clearly established law.

We hold that the Officers are entitled to qualified immunity. Thus, we **AFFIRM.**