NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0326n.06

Case No. 22-5093

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 09, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE |
| v. | ) ) | |
| TECARLIOUS HEARN, | ) | |
| Defendant-Appellant. | ) ) | OPINION |

Before: MOORE, GRIFFIN, and THAPAR, Circuit Judges.

THAPAR, Circuit Judge. While investigating a domestic-violence call, police officers discovered that Tecarlious Hearn had a semiautomatic rifle. Because he was both a felon and had recently been convicted of a domestic-violence offense, he was not allowed to possess the rifle. Thus, he was arrested and charged. Hearn moved to suppress the evidence uncovered during the officers' investigation. But the district court denied his motion. We affirm.

I.

In June 2019, Acacia Harden called the Memphis Police Department to report a domestic-violence incident. Harden told the dispatch officer her address. And she explained that her "kid's father"—who she identified as Tecarlious Hearn—had "just got out of jail for domestic violence" and was "trying to start back acting up." R. 63, Pg. ID 78. But she stated that no weapons were involved.

The dispatch officer relayed the call to two officers, Christopher Tracy and Brian Barnes. The dispatch officer provided Harden's address, described Hearn's outfit, and explained that Hearn "was just released from jail for domestic violence." *Id.* at 79. But the dispatch officer didn't pass on Harden's statement that no weapons were involved.

Officer Tracy recognized the address. He had been there just a month before to respond to another domestic-violence call involving Hearn and Harden. And during that visit, he saw blood on the front steps and even more blood inside. But Harden was not home. After several attempts to contact Harden, Officer Tracy eventually tracked her down at a local hospital. Harden told him that Hearn had been "hitting" her, causing "abrasions" and "swelling" to her eye. *Id.* at 80.

This time, the officers arrived at the house within minutes of Harden's call. They turned on their body cameras, which began recording with audio. They then exited their car and began walking toward the house. After a few steps, however, they heard "loud screaming" and a "loud noise" that sounded like "a slap or a punch." R. 92, Pg. ID 227. Believing "an assault was taking place right then," Officer Tracy drew his gun and the pair sprang into action. *Id.* at 228. They rushed to the front entrance, yanked open a glass storm door, and entered the house.

Inside, the officers didn't see Harden. But they saw a man matching Hearn's description sitting on the couch and holding an object in his hand. They ordered Hearn to drop his weapon. Startled, Hearn held up his cellphone and said that he didn't have a weapon. The officers also saw a second man standing off to the side holding a pair of shoes. Officer Tracy told him to drop the shoes, and he complied.

Officer Tracy then asked Hearn to stand up. Once he did, Officer Tracy immediately frisked him for weapons. Finding none, he told Hearn to go stand next to the other man. On his way over, Hearn stated that "there is a weapon in the house" and asked to show it to the officers.

R. 63, Pg. ID 82. Officer Tracy told him no, explaining that he didn't "care about that right now." *Id.* He told Hearn and the other man to "relax" and asked Hearn for identification. *Id.* Hearn stated his name and repeated: "There is a weapon in the house." *Id.* at 91.

For their own safety, the officers placed Hearn in handcuffs. In the process, Hearn disclosed that he had just been released from jail. And he confirmed that he had been involved in many police encounters before. When asked about Harden, Hearn said that she had just left. So the officers called her and told her to return to the house.

About a minute later, Officer Tracy asked Hearn where the weapon was. Hearn gestured to the couch he had been sitting on: "The weapon is right there, right up under there." *Id.* at 83, 91. Hidden under a pillow, Officer Tracy found a semiautomatic M4 carbine. It was loaded with twenty-six rounds of ammunition. As Officer Tracy secured the rifle, Hearn said: "I like the way you handle that. You look like me with that thing." *Id.* at 83.

Hearn was charged with (1) possession of a firearm after being convicted of a felony in violation of 18 U.S.C. § 922(g)(1), and (2) possession of a firearm after being convicted of a misdemeanor crime of domestic violence in violation of section 922(g)(9).

Hearn moved to suppress the firearm and his statements. The court referred the motion to a magistrate judge, who held an evidentiary hearing and recommended denying the motion. The district court agreed. So Hearn entered into a conditional plea agreement, and the district court sentenced him to 70 months in prison.

## II.

Because Hearn appeals the denial of his motion to suppress, we take the evidence in the light most favorable to the government. We review questions of law de novo and factual findings for clear error. *See United States v. Ickes*, 922 F.3d 708, 710 (6th Cir. 2019).

III.

Hearn contends that the officers violated his constitutional rights in two ways. First, he argues that the officers' warrantless entry into his home violated the Fourth Amendment. And second, he claims that the officers didn't have reasonable suspicion to frisk him for weapons. We address each in turn.

A.

Start with Hearn's argument that the officers violated the Fourth Amendment by entering his home without a warrant. The Fourth Amendment protects "persons, houses, papers, and effects" from "unreasonable searches and seizures." U.S. Const. amend. IV. The "very core" of that guarantee is "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021) (citation omitted). To ensure that right is adequately protected, Supreme Court precedent typically requires officers to get a warrant before conducting a search. *See, e.g.*, *Lange v. California*, 141 S. Ct. 2011, 2017 (2021).

But there are exceptions. And one of those exceptions allows the police to enter a house without a warrant to "protect an occupant from imminent injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Instead, when delaying entry could lead to serious consequences for the victim, officers are not "bound to learn anything more or wait any longer before going in." *United States v. Banks*, 540 U.S. 31, 40 (2003). So long as they have an "objectively reasonable basis" for believing an occupant is in imminent danger, they may immediately enter the house. *Brigham City*, 547 U.S. at 406; *see also Michigan v. Fisher*, 558 U.S. 45, 49 (2009).

The imminent-injury exception to the warrant requirement applies here. Even before arriving at the house, the officers knew it had recently been the scene of a bloody domestic attack

that sent its victim to the hospital. They also knew that Hearn had just been released from jail for domestic violence. And when they arrived at the house, the officers were immediately confronted with "loud screaming" and a "loud noise" that sounded like "a slap or a punch" coming from inside. R. 92, Pg. ID 227. Fearful that Hearn was attacking Harden again, the officers rushed to her defense. These facts supplied an "objectively reasonable basis" for the officers to believe Harden was in imminent danger. *Brigham City*, 547 U.S. at 406; *see Lawrence v. Bloomfield Township*, 313 F. App'x 743, 747 (6th Cir. 2008) (per curiam) (911 domestic-violence call and indicia of a recent altercation, among other things, constituted exigent circumstances). The officers therefore had a right to enter the house without a warrant.

Hearn resists this conclusion, suggesting that the officers "could have simply looked through the glass door and seen that there was no 'assault' occurring in the residence." Appellant Br. 14. One "can almost always imagine some alternative means by which the objectives of the police might have been accomplished." *United States v. Sharpe*, 470 U.S. 675, 686–87 (1985). But it's not our job to decide whether the police could have chosen a "less intrusive means" to ensure the occupants' safety. *Id.* (citation omitted and cleaned up). Instead, we are tasked only with assessing whether the means the officers *did* choose was reasonable. And for the reasons explained above, we conclude that it was.[1]

B.

Hearn also argues that the officers violated the Fourth Amendment when they frisked him for weapons. According to Hearn, Officer Tracy lacked reasonable suspicion to frisk him because

---

[1] Hearn suggests the officers should have left the house immediately after seeing that he was not actively attacking Harden. But Hearn made his first statement about the firearm shortly after the officers entered the house. And at that point, the officers still couldn't be sure whether Harden, or another victim, had been attacked and was somewhere else in the house. As one of the officers put it, they "hadn't had an opportunity at that time to do a protective sweep." R. 92, Pg. ID 269. Thus, we cannot say that the officers acted unreasonably. *Cf. Stricker v. Township of Cambridge*, 710 F.3d 350, 362 (6th Cir. 2013).

there "were no particular facts from which it could reasonably be inferred that he was armed and dangerous." Appellant Br. 19. Thus, Hearn says, his statements about the weapon in the house must be suppressed as fruit of the poisonous tree.

Even assuming Hearn is right that the frisk was unconstitutional, the district court still properly denied his motion to suppress. The fruit-of-the-poisonous-tree doctrine applies to evidence "derived from information or items obtained in the illegal search." *United States v. Elmore*, 18 F.4th 193, 200 (6th Cir. 2021) (cleaned up). As the government points out, however, the officers' frisk produced no fruit—they didn't discover "any evidence" during the frisk. Appellee Br. 18 n.3. Indeed, Hearn first announced there was a weapon in the house only after the fruitless frisk ended. As Hearn's counsel put it at oral argument, that statement was a "spontaneous utterance." Oral Arg. at 14:12–14:15. Hearn has not explained how that statement or his subsequent statements about the weapon were "derived from information or items obtained" during the frisk. *Elmore*, 18 F.4th at 200 (citation omitted). The district court thus properly denied Hearn's motion to suppress.

\* \* \*

This Nation's police officers perform difficult and dangerous work every day. The Fourth Amendment doesn't stop them from taking reasonable measures to protect themselves and others when necessary. We affirm.